**UNITED STATES of America,**

v.

**Ryan James EFF.**

**Criminal No. 9:06–cr–16.**

United States District Court,
E.D. Texas,
Lufkin Division.

Nov. 6, 2006.

Frank Warren Henderson, Federal Defender's Office, Beaumont, TX, for Ryan James Eff.

John Malcolm Bales, U.S. Attorney's Office, Lufkin, TX, for United States of America.

## ORDER

CLARK, District Judge.

### I. Introduction

Ryan James Eff was charged with maliciously and intentionally damaging and destroying, by means of fire, real property owned by the United States in violation of Title 18, United States Code, Section 844(f)(1) and (2). Eff gave notice of an insanity defense. He identified two expert witnesses to testify about a condition he had, Klinefelter Syndrome, and how that affected his ability to appreciate the nature and quality or wrongfulness of his acts. Analyzing the proposed testimony in light of Fed.R.Evid. 702 and 403 and the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17 (IDRA), the court concludes the experts' testimony should be excluded because: 1) the witnesses fail to apply the principles and methods reliably to the facts of the case under Fed.R.Evid. 702; and 2) any probative value of the testimony is substantially outweighed by its potential to mislead and confuse the jury.

## II. Background

### A. Defendant Sets Fires

Eff was employed as a firefighter for the United States Forest Services (USFS), which is a federal government agency. USFS Special Agent Gary McLaughlin was investigating a series of forest fires which occurred in the Davy Crockett National Forest and received information that made Eff a suspect in the case. Agents discovered tire tracks at the point of origin of several fires which were similar to the tread on the tires of Eff's government vehicle. McLaughlin obtained a Global Positioning Satellite (GPS) device and had it installed on Eff's government vehicle. Utilizing the data from the GPS, McLaughlin was able to place Eff's vehicle at the point of origin in three subsequent forest fires.

McLaughlin interviewed Eff about the fires. Initially, Eff was helpful and cooperative. Eff asked whether agents had been tracking the fires on a map and noted that the arsonist seemed to be getting bolder. Eff opined that the arsonist was probably starting the fires with a lighter and that one particular fire did not seem to fit the profile. McLaughlin told Eff that he thought Eff was lying and told Eff about the tire tracks. Eff then confessed that he started the fires and that he was responsible for starting 15 of 20 of the forest fires, which he was then assigned to help extinguish. Eff stated he had hoped that the resulting increase in experience as a firefighter would qualify him for a promotion. Additionally, he earned hazardous duty pay while fighting fires, so every fire increased his income.

### B. Proposed Expert Testimony

■ Under 18 U.S.C. § 17, a finding of insanity requires proof by clear and convincing evidence that:

> the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.

Proof of insanity is normally presented through expert testimony. *See U.S. v. Dixon*, 185 F.3d 393, 404 (5th Cir.1999). Eff identified two experts.

### *Dr. Kyle Boone*

Dr. Kyle Boone, a neuropsychologist, evaluated Eff on July 11, 2006. According to Dr. Boone, Eff was diagnosed with Klinefelter's Syndrome in July 2005, before fire investigation started.[1] Dr. Boone's evaluation describes Eff's life history from childhood to the present as it bears on his psychological condition. Eff indicated to Dr. Boone that he used methamphetamine, marijuana and LSD from age 21 through 29 and that he was using drugs every day until May of 2001.

Dr. Boone administered a battery of tests to measure Eff's cognitive abilities: the Wechsler Adult Intelligence Scale–III (WAIS–III), Rey Auditory Verbal Learning Test, Rey–Osterereith Complex Figure, Verbal Fluency, Wechsler Memory Scale–Revised, Trailmaking, Boston Naming Test, Comalli Stroop Test, Ruff Figural Fluency Test, Wisconsin Card Sorting Test, Wide Range Achievement Test–4, and Finger Tapping. Eff's learning and memory skills were within normal limits and his immediate recall reproduction of

---

1. The government does not dispute that Eff has been diagnosed with Klinefelter Syndrome. This is a condition in which males have two "X" chromosomes instead of one, i.e. their chromosomes are described as XXY instead of XY. The condition may result in variety of characteristics, including a youthful and sometimes effeminate appearance, language based disabilities, social skill deficits, depression and anxiety. Treatment may include counseling and hormone replacement.

geometric figures was nearly within the high average range. Verbal subtests included scores ranging from borderline to average levels. Eff's math calculation ability was "borderline" and low average scores were present on subtests for verbal abstractions and basic attention.

Based upon her examination, Dr. Boone concluded that Eff's current IQ scores were within expectation for educational and occupational level. She stated that the results "indicate that the patient lacks the basic brain 'hardware' to exert consistent, reasoned control over his behavior".

During the *Daubert* hearing, Dr. Boone testified that Mr. Eff approaches situations at the developmental level of a child. More specifically, she said that Eff's ability to appreciate the wrongfulness of his actions is at the level of a 10– to 12–year–old.

*Dr. Carole A. Samango–Sprouse*

Dr. Carole A. Samango–Sprouse is a neurodevelopmentalist. To conduct her evaluation, Dr. Sprouse reviewed Dr. Boone's findings and Eff's statements. Dr. Sprouse indicates that Eff suffers from "poor executive function and diminished frontal lobe capacity, which is highly associated with his neurogenetic disorder of XXY or Klinefelter Syndrome.... His late diagnosis and lack of treatment resulted in diminished cognitive capacity and limited control over his own behavior, based on Dr. Boone–Bauer." At the *Daubert* hearing, Dr. Sprouse opined that Eff was operating at an 8–year–old level. She stated that one might expect a child of that age to do something wrong and correct it in order to impress a parent.

## II. Law and Analysis

### A. Evaluation of Experts Under Rule 702

Fed.R.Evid. 702 provides

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case.

■ The Federal Rules of Evidence apply to criminal, as well as civil cases. Fed. R.Evid. 101. Rule 702 codifies the *Daubert* line of cases, under which the trial court performs a gatekeeping function in regulating the admissibility of expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–95, 113 S.Ct. 2786, 2794–2798, 125 L.Ed.2d 469 (1993). This gatekeeping function requires a preliminary evaluation of both the reliability and the relevance of the proffered expert testimony. *Id.*

The government does not challenge the qualifications of Dr. Boone or Dr. Sprouse.[2] The question is whether the experts' opinions of insanity are based on reliable methods reliably applied to the facts of the case and whether any probative value of the testimony is substantially outweighed by its potential to mislead or otherwise confuse the jury. Previous opinions have set out a number of factors

---

2. In any event, having reviewed the curriculum vitae of Dr. Boone and Dr. Sprouse, including their educational background, experience, certification and publishing history, the court concludes that they appear to be qualified to testify as experts regarding Eff's cognitive abilities and Klinefelter's Syndrome.

which may be used to evaluate admissibility under Fed.R.Evid. 702.

■ The first factor is whether the theory or technique in question has been, or can be, tested. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. Dr. Boone administered a battery of standardized psychological tests, including 13 separate subtests that comprise the Weschler Adult Intelligence Scale–III (WAIS–III) and the 18 separate subtests that comprise the Weschler Memory Scale. In the course of their evaluation, Dr. Boone interviewed Eff and Dr. Sprouse reviewed Eff's statements. The tests used, and the interview, are part of a standard psychological evaluation, and can be repeated. While it is not so clear that the conclusions of insanity or any link between Klinefelter Syndrome and insanity can be, or has been, tested, this factor weighs in favor of admitting the experts' testimony.

■ The court must also look at the potential rate of error, or the confidence level. *Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797. While reasonable confidence levels have been established for the battery of instruments the experts used to test cognitive factors such memory, problem solving, and spatial thinking, the same is not true of their efforts to link Klinefelter with insanity or fire-setting. A study used by Dr. Boone, "Fire–Setting Behavior Associated with Klinefelter Syndrome," stated that fewer than ten cases of Klinefelter Syndrome associated with fire-setting behavior had been reported. Ariel Eytan et al., *Fire–Setting Behavior Associated with Klinefelter Syndrome,* Int'l J. Psychiatry in Medicine (2002). The study found six people with a history of arson among 31 Klinefelter patients identified in psychiatric hospitals and penal institutions. However, this study, in and of itself, is unreliable without more information. A study of only 31 individuals already bound to a psychiatric hospital or penal institution is a small sample, which is not representative of the general population, or even of all Klinefelter patients. Without additional samples, the study is not enough to conclude that Klinefelter patients do not appreciate the wrongfulness of their acts, or even that it is statistically likely that they will set fires. This factor weighs against admissibility.

■ The court also looks at whether the theory or technique has been subjected to peer review. *Id.* It is clear that the standard tests used by Dr. Boone have been widely administered. *See Atkins v. Virginia,* 536 U.S. 304, 309 n. 5, 122 S.Ct. 2242 n. 5, 153 L.Ed.2d 335 (2002)(noting that the WAIS–III is the "standard instrument in the United States for assessing intellectual functioning"). It is not clear, and Eff has presented no evidence, that there has been peer review of a link between Klinefelter Syndrome (and its accompanying diminishment in frontal lobe function and executive function) with insanity as defined by Congress. The website for the American Association for Klinefelter Syndrome states that "currently studies have shown that the diagnosis of Klinefelter Syndrome does NOT indicate mental retardation, deviant behavior or other broad generalizations. Most individuals diagnosed with this condition have average to superior intelligence with only about 20% scoring below average on standardized intelligence tests." A Guide to Klinefelter Syndrome, http:/ /www.aaksis.org/Documents2/ Klinefelter_Brochure_.pdf. (emphasis in original.) It has not been shown that the experts' theory linking Klinefelter Syndrome in general, or Eff's case in particular, has been peer reviewed. This factor weighs against admissibility.

■ Another factor is whether the testimony offered by the two experts is

based on research the experts have conducted independent of the litigation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995). Dr. Sprouse co-authored an article called "XXY (Klinefelter Syndrome): a Pediatric Quantitative Magnetic Resonance Imaging Study" (Pediatrics-in press 2006). Dr. Boone is conducting research on Klinefelters and presented two papers titled, "Neuropsychological Characteristics of Klinefelter's Syndrome" and "Neuropsychological Profiles of Adults with Klinefelter Syndrome." However, none of these papers discusses a link between Klinefelter's Syndrome and an inability to appreciate the nature and quality or the wrongfulness of one's acts. Dr. Boone's own article, "Neuropsychological Profiles of Adults with Klinefelter Syndrome," states that "the evidence for a dyxexecutive syndrome in Klinefelter Syndrome could help account for the behavioral abnormalities, including poor judgment, impulsivity, failure to consider consequences of one's behavior and deficits in social skills, often observed in this population." Significantly, she continues, "However, not all Klinefelter Syndrome patients display behavioral difficulties … *confirmation of this hypothesis awaits further research.*" (emphasis added). In this instance, the "further research" was performed on Eff, for this case. Therefore, this factor is, at best, neutral.

■ The next factor is whether the expert has adequately accounted for obvious alternative explanations. *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir.2000). Dr. Boone did not study the case materials or the interview transcript. Instead, she leafed through them and admitted that they did not have a major impact on her conclusions. Dr. Sprouse read Eff's confession but based her report almost entirely on Dr. Boone's findings and her knowledge of Klinefelter Syndrome, instead of a personal evaluation of Eff. Eff had confessed that he started the fires in order to advance his career. Neither expert accounted for the obvious alternative explanations that he started the fires in pursuit of a promotion or because he was paid more when fighting fires. There was also no real discussion of how this evidence of planning fitted into their conclusion of low cognitive functioning and insanity other than to say it was immature reasoning. But the same could be said for most criminals who don't think about getting caught, or don't believe they will be apprehended. That does not make them insane under 18 U.S.C. § 17. This factor weighs against admitting the experts' testimony.

■ Another factor is whether the expert has employed the same care in reaching the litigation-related opinions as the expert employs in performing his or her regular professional work. *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir.1997). While Dr. Boone did not study the case materials and Dr. Sprouse did not interview Eff, there is no indication that either doctor improperly administered any of the tests or was not careful in their diagnosis. This factor weighs slightly in favor of admitting the testimony offered by both experts.

■ Finally, the court decides whether there is "too great an analytical gap" between the data and the opinion. *General Electric Co. v. Joiner*, 522 U.S. 136, 144–147, 118 S.Ct. 512, 518–520, 139 L.Ed.2d 508 (1997). Dr. Boone and Dr. Sprouse provide evidence that Eff operated at a low normal level of various cognitive functions.[3] However, all of these tests produce

---

**3.** This was not true for all tests. Eff's immediate recall reproduction of geometric figures was nearly within the high average range.

results that formulate a bell curve so that the first standard deviation will take in a large percentage of the population. The fact that Eff is in the low end of the "normal" range can not be evidence that he is insane. By definition, half of the population within the first standard deviation of a bell curve is below the median.

Dr. Boone agreed that from a psychologist's definition of insanity, which would involve aberrations such as psychosis, hallucinations, and delusions, "he is not insane." But, as she pointed out, we are dealing with the statutory definition of being unable to appreciate the nature and quality or wrongfulness of actions.

When asked whether Eff could appreciate the wrongfulness of his acts, Dr. Boone stated that based upon the cognitive deficits revealed by the objective testing, he would be at a 10– to 12–year–old level. Similarly, Dr. Sprouse concluded that Eff operates as an 8–year old, who does something "wrong" in order to correct it and impress his boss.

Does an ability to appreciate wrongfulness only at the level of a child between 8 and 12 years of age make one insane? The court has found no authority for such a sweeping generalization. Courts have long allowed children as young as six years old to testify because "there is no precise age which determines the question of competency. This depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as of his duty to tell the former." *Beausoliel v. U.S.*, 107 F.2d 292, 293 (D.C.1939).[4]

Congress specifically defined insanity as "*unable* to appreciate" the wrongfulness of actions. 18 U.S.C. § 17 (emphasis added).

Accepting all of Dr. Boone and Dr. Sprouse's testimony as true, the evidence would show lower intellectual abilities and motor skills in Eff, but would not show that Eff has an inability to appreciate the wrongfulness of his actions. At most, there is a reduced capacity. If Congress wanted the insanity defense to apply to those of reduced capacity or immature thought patterns, it could have so provided.

The analytical gap between tests which show "low normal" functioning and an immature thought process on one hand and a conclusion of insanity on the other is just too great. The gap between the evidence concerning Klinefelter Syndrome and a diagnosis of insanity is even greater. This factor weighs heavily against admission of the testimony.

None of the factors discussed is determinative. But, on balance, the court can not find that the proposed testimony is the product of reliable principles and methods applied reliably to the facts of this case.

## B. Rule 403 Balancing

The balancing of Rule 702 factors is not an exact process. An argument could be made that the testimony is at least somewhat reliable, so that it should be admitted and a jury could determine its weight. But a court must still consider, whether the probative value of testimony is substantially outweighed by the danger of confusion of the issues or its tendency to mislead the jury. Fed.R.Evid. 403.

The need to apply Rule 403 was made clear by Congress when it enacted 18 U.S.C. § 17. That section provides that insanity is an affirmative defense requiring proof by "clear and convincing evidence"

---

**4.** The court recognizes that there is a difference between the tests for competency and insanity.

that "the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."

Congress intended to "emphasize that non-psychotic behavior disorders or neuroses such as 'inadequate personality', 'immature personality', or a pattern of 'antisocial tendencies' do not constitute the defense." *Dixon*, 185 F.3d at 399. "Congress was concerned about the danger that expert psychiatric testimony regarding inherently malleable psychological concepts can be misused at trial to mislead or confuse the jury". *US v. Cameron*, 907 F.2d 1051, 1062 (11th Cir.1990).

■ The proposed testimony of Dr. Boone and Dr. Samango–Sprouse has a great potential to improperly suggest that some form of the abolished diminished capacity defense is available to the defense or that the defendant would be entitled to sympathy and possibly acquittal. The jury would have to speculate whether diminished capacity to appreciate wrongfulness, in someone in the low normal range of intelligence, is the same as being unable to appreciate wrongfulness. The presentation to the jury could quickly degenerate from a search for "clear and convincing evidence" of insanity, into a plea for pity for a defendant with unusual problems. These dangers substantially outweigh the probative value of the proposed testimony.

## C. Due Process Concerns

Eff argues that under *Holmes v. South Carolina*, —— U.S. ——, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), this court's ruling would abrogate his Sixth Amendment right to present a defense. In *Holmes*, the Supreme Court struck down a South Carolina rule which allowed evidence to be excluded if it merely cast suspicion upon a third party. The rule violated due process concerns because the exclusion of otherwise admissible evidence that might assist defendant, served no legitimate purpose. Under the South Carolina rule, the trial judge would decide admissibility based upon the strength of the prosecutor's case instead of focusing "on the probative value or the potential adverse effects of admitting the defense evidence of third party guilt." *Id.* at 1729.

Here, the court is analyzing Eff's proposed expert testimony under Fed.R.Evid. 702, based upon the reports and statements of those experts. Just because Eff is a criminal defendant does not abrogate the court's duty to determine admissibility of evidence. *US v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998). An unreliable, improperly supported opinion linking Klinefelter Syndrome with insanity is no more probative in a criminal case than in a civil case. *Holmes* emphasized that the Constitution "permit[s] trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See e.g.*, Fed. Rule Evid. 403." *Id.* at 1728.

The record is devoid of any evidence that Eff's mental defect creates anything other than a "psychological immaturity," a diagnosis which falls far short of insanity. *See United States ex rel. Salisbury v. Blackburn*, 792 F.2d 498, 501 (5th Cir. 1986). As posited, the experts' testimony would require a jury to speculate as to whether Eff met the legal definition of insanity.

## III. Conclusion

The court finds that even if the experts' testimony were admitted, it would not allow a reasonable jury to conclude that Eff was unable to appreciate the nature and quality or wrongfulness of his actions. At best, the jury would only be able to determine that Eff had a severe mental defect

that reduced his capacity for such appreciation. The testimony about Klinefelter causing a severe mental defect might be admissible if there was other evidence to tie that mental defect into an inability (rather than reduced capacity) by Eff to appreciate the wrongfulness of his acts. But Defendant did not present the testimony of these two experts as mere "building blocks," which would be tied in with other evidence to establish Eff's inability to appreciate the nature and quality or wrongfulness of his actions. Rather, his case rests squarely on the experts' testimony.[5] For the reasons stated, their reports and testimony, taken by themselves, or together, do not meet the requirements of Rule 702 and should be excluded under Rule 403.

IT IS THEREFORE ORDERED that the proposed testimony of Dr. Boone and Dr. Sprouse shall not be admitted.

So **ORDERED** and **SIGNED** this 6 day of **November, 2006.**

---

5. Eff's counsel stated there could be testimony from family members about Eff's problems growing up and various learning disabilities. This was summarized in the expert's report. Accepting all of this as true, a reasonable jury could *still* only *speculate* about insanity, and Congressional intent to limit the defense would be thwarted.